**John DEARSON and Anne Marie Dearson, his wife,**

v.

**BOSTROM SEATING, INC., and American Transportation Corp.**

**No. CIV.A. 01–4683.**

United States District Court, E.D. Pennsylvania.

Jan. 21, 2003.

Walter D. Campbell, Levittown, PA, for Plaintiffs.

Walter D. Ptiore, McCormick & Priore, Philadelphia, PA, for Bostrom Seating.

Robert Hafner, Lavin, Coleman, O'Neil, Ricci, Finarelli & Gray, Philadelphia, PA, for Robert Hafner.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

Defendants, Bostrom Seating, Inc. and American Transportation Corporation have filed a "Daubert" Motion to Preclude two of Plaintiff's Expert Witnesses from testifying at the trial of this matter. For the reasons articulated below, the motion shall be granted.

### History of the Case

This case has its origins in an accident which occurred on November 29, 1999 when the husband-plaintiff, John Dearson, was driving his Laidlaw school bus across Route 13 in Bristol, Pennsylvania. The bus, which was manufactured and sold by defendant American Transportation Corporation (a/k/a "AmTran") to Laidlaw, was outfitted with an air seat manufactured by defendant Bostrom Seating. Plaintiff alleges that as he crossed Route 13, he encountered a depression or swale in the roadway and that the bus seat "bottomed out" causing his back and buttocks to strike the metal supporting assembly of the seat, thereby injuring him. He thereafter instituted this lawsuit in September, 2001 alleging that the seat as designed, manufactured and installed was in a defective and dangerous condition. To that end, Plaintiffs retained John Reed Davis and Stephen Suckey as their experts and it is these experts whom Defendants now move to preclude from testifying at trial.

### Daubert Standards for Expert Witnesses

As a general proposition, "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court . . ." Fed. R.Evid. 104.

It has been said that "[u]nlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation. This relaxation of the usual requirement of firsthand knowledge . . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993), quoting the *Advisory Committee's Notes on Fed.Rule Evid. 602*, 28 U.S.C.App. p. 755. "Federal courts have maintained a liberal policy of admitting expert testimony because, once the court decides that the expert's testimony would be helpful to the jury, the jury is entitled to evaluate the testimony and the court has broad discretion in determining when an expert is qualified to render a helpful opinion." *Montgomery County v. Microvote Corporation*, 152 F.Supp.2d 784, 798 (E.D.Pa.2001), quoting *Dorsett v. Am. Isuzu Motors, Inc.*, 805 F.Supp. 1212, 1224–25 (E.D.Pa.1992), *aff'd*, 977 F.2d 567

(3d Cir.1992), *cert. denied,* 506 U.S. 1089, 113 S.Ct. 1071, 122 L.Ed.2d 498 (1993).

■ Prior to 1993, expert opinion evidence based upon a given scientific technique was examined to determine if it was generally accepted as reliable by the relevant scientific community. *Frye v. United States,* 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923). In 1993, however, the U.S. Supreme Court decided *Daubert, supra,* and in so doing recognized that the *Frye* standard had been superceded by the adoption of the Federal Rules of Evidence. Under those rules, opined the *Daubert* Court, general acceptance of a given scientific technique by the relevant scientific community is but one element to consider in determining admissibility. *See, Daubert,* 509 U.S. at 597, 113 S.Ct. at 2799. Under *Daubert,* (the application of which has been extended to the testimony of engineers and other technical experts who are not scientists) [1] and the Third Circuit Court of Appeals' decisions in *Oddi v. Ford Motor Co.,* 234 F.3d 136 (3d Cir. 2000), *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, (3d Cir.1994) and *United States v. Downing,* 753 F.2d 1224 (3d Cir. 1985), there are at least eight factors which should be considered in assessing the admissibility of expert opinion testimony. These are: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the

non-judicial uses to which the method has been put. *See, e.g., Oddi,* 234 F.3d at 145; *Paoli,* 35 F.3d at 742, n. 8; *Paoline v. Kilgo Trucking, Inc.,* Civ. A. No. 00–956, 2002 WL 826421 (E.D.Pa.2002).

■ Thus, "[t]he focus of a *Daubert* inquiry must be solely on the principles and methodology, not on the conclusions that they generate." *Diaz v. Johnson Matthey, Inc.,* 893 F.Supp. 358, 373 (D.N.J.1995), quoting *Daubert,* 113 S.Ct. at 2797. The evidentiary requirement of reliability is lower than the merits standard of correctness; a judge decides whether the experts are reliable and the jury decides whether they are correct. *Id.,* citing *Paoli,* 35 F.3d at 744.

More recently, Fed.R.Evid. 702 was amended to reflect the standards for admissibility of expert witness testimony outlined in *Daubert.* Specifically, Rule 702 now provides:

### Rule 702. Testimony by Experts

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

■ Thus, a proponent of expert testimony need not prove to the court that the expert opinions are correct, but must demonstrate by a preponderance of the evidence that they are reliable, which is to say that the particular opinion is based on

---

1. *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)

valid reasoning and reliable methodology. *Paoline*, at *4, citing *Oddi*, 234 F.3d at 146 and *Kannankeril v. Terminix International, Inc.*, 128 F.3d 802, 806 (3d Cir.1997); *Rapp v. Singh*, 152 F.Supp.2d 694, 699 (E.D.Pa.2001).

### *Discussion*

In this case, the plaintiffs have identified a registered professional engineer, John Reed Davis and Stephen J. Suckey, whose area of purported expertise is unclear, as their expert witnesses on liability. At page 21 of their March 14, 2002 report, Messrs. Davis and Suckey concluded that:

"Based on the information we have gathered, including data on the Bostrom air suspension seat, the Amtran bus, the road surface at the acciden(sic) site, the surgeon's description of the compression injury and our test results of testing of the seat and its critical components, it is our conclusion that the seat is defective in its design and its application.

The Bostrom seat requires, as an important component for stability and safety for any and all drivers, a pair of tethers or a well designed and tested equal such as a pair of adjustable rods. Because their necessity was so clear during our testing it is absolutely essential that the tethers or another effective device be a part of the total seat assembly from the seat manufacturer. Merely referencing a general safety regulation from any agency directed to the installer doesn't make that seat safe.

Equally important as an component is the air suspension spring that does include adequate capacity for different driver weights and heights as well as the operating conditions of the vehicle. Integral with this component is a reliable source of air which is not subject to slow leaking. This to be accomplished by providing more reliable hose or piping plus a check valve at the spring as well as a pressure gage to monitor its air pressure.

Our testing brought out the fact that any dampener device if it is to serve as a limiter to the ultimate up and down seat motion must be adequate for the maximum air pressure in all positions of the air suspension spring and for the largest driver. Whatever the size of that dampener it must be assembled with the tethers for most or all movements of the seat. There is good reason to believe that for an additional $15.00 the heavy duty dampener would best serve all drivers in the Bostrom seat.

The bus owner and operator did not staff and provide adequate maintenance support to their drivers who uncover problems on their vehicles which went unattended because the mechanics left at 5 p.m. The problems with the seats left the seat manufacturer and continued on with the completed bus as delivered to the owner. It may be possible that the owner's maintenance could be more adequate if they had been properly addressed back with the seat's designers and builders.

We believe our conclusion of a defective design of the seat that was further perpetuated by the bus builder is based on reasonable technical, scientific and engineering certainty."

While these conclusions adequately outline the types of characteristics which Messrs. Davis and Suckey believe an air seat should have, it is difficult if not impossible to discern the basis for these beliefs or to determine the manner in which Mr. Dearson's seat in particular was defective. It is likewise unclear from their report how these experts reached the conclusion that the affected seat itself was defectively designed and/or maintained, *i.e.*, what tests were conducted on the seat at issue.

In September, 2002, Defendants deposed both Mr. Davis and Mr. Suckey, presumably for the purpose of eliciting the foregoing information. In the course of these depositions, it became clear that neither Mr. Davis nor Mr. Suckey had had any experience in testing or investigating the design and other characteristics of air seats prior to this case. (See, *e.g.*, Defendants' Exhibit "F," p. 30–39; Exhibit "G," pp. 300).[2] In so far as research was concerned, the record reflects that Mr. Suckey reviewed some literature on air seats from Bostrom and Firestone and that Mr. Davis endeavored to find out what competitors to Bostrom manufactured air seats. Mr. Davis also talked to a truck driver who drove a vehicle with an air seat and asked him how the seat worked for him. (See, Exhibit "F," pp. 140–143).

The experts did inspect the bus and seat in issue on two occasions[3], at which time measurements and photographs of both were taken. (Exhibit "F," at 91–95). Mr. Suckey also subsequently conducted several "road tests" in September, 2001, which consisted of first installing heavy duty dampers in the Laidlaw busses equipped with the Bostrom air seats and then having various Laidlaw bus drivers drive those busses and give him their subjective opinions regarding how those seats then functioned and how the buses rode. (Exhibit "G", pp. 350–376). Relying upon the results of these tests, Messrs. Suckey and Davis concluded that the dampers on the seat were defective because the tether belts, which should have been tightened down in such a fashion that the seat would not move vertically, could not be reached and because Mr. Dearson's seat may have had an air leak[4] which could have been prevented if a check valve had been installed. (See, e.g., Exhibit "F," at pp. 220–229; 250–260; Exhibit "G," at pp. 377–383). While Mr. Suckey was present on September 27, 2001 when Laidlaw mechanic Mike Esposito drove the buses first with the original, standard damper and then with the heavy duty damper, the record reflects that he *himself* did not operate the bus or the seat. Mr. Suckey was apparently *not* present when the regular Laidlaw drivers drove their usual routes with the heavy duty dampers installed. Unlike Mr. Suckey, Mr. Davis was not present for any of the tests and in fact, never rode in the bus or sat in the seat at all. (See Exhibit "F" at p. 171; Exhibit "G," p. 374–375). It should be noted that these were the *only* tests that were conducted on the seat and bus which purportedly caused Mr. Dearson's injuries and were the only tests offered to support these experts' opinion that the air seat was defective.

■ In evaluating the foregoing evidence in conjunction with the *Daubert* /Rule 702 standards, we cannot find that the plaintiffs' experts are either qualified to testify based on their methodology or that the methods used to examine the Bostrom air seat are sufficiently valid and reliable to justify the conclusions reached

2. In fact, Mr. Davis only had one prior experience in investigating a possible design defect in a vehicle seat—that case involved the alleged defective design of a reclining front passenger seat of a 1989 Pontiac LeMans. (Exhibit "F," p. 32–35).

3. These inspections took place on September 6, 2001 and January 29, 2002. (Exhibit "F," p. 133–134).

4. Plaintiffs' experts based their conclusion that there may have been an air leak and that the seat may have been deflated at the time of Mr. Dearson's accident not on their inspection or testing of the seat in question but upon the fact that they were told by the driver who got the bus after Mr. Dearson left Laidlaw that the seat had a history of leaking air. (See, e.g., Exhibit "F," at pp. 247–248).

in this case.[5] Indeed, plaintiffs have provided no evidence that the testing method used here has been subjected to peer review or is generally accepted as reliable or that it is comparable to a methodology which *has* been previously deemed reliable. There is in fact no evidence that Messrs. Davis and Suckey's methods have ever been used before by anyone, in either a judicial or non-judicial setting. By their own admissions, they do not actually know the condition which the seat was in on the day that Mr. Dearson suffered his injury, nor have they conducted any tests or analysis of any alternative air seat designs. (See, e.g., Exhibit "F," at pp. 247–248, 251–260).

It is therefore clear that the opinions of Mr. Suckey and Mr. Davis are not based upon adequate data or facts nor are they the product of reliable principles and methods. For this reason, we must conclude that the proposed expert testimony of Messrs. Suckey and Davis does not meet the standards imposed under *Daubert* and its progeny and that they are properly precluded from testifying at the trial of this matter.

An appropriate order follows.

### ORDER

AND NOW, this day of January, 2003, upon consideration of the *Daubert* Motion of Defendants to Preclude Testimony of Plaintiffs' Liability Experts, it is hereby ORDERED that the Motion is GRANTED for the reasons set forth in the preceding Memorandum Opinion and John Reed Davis and Stephen J. Suckey are hereby PRECLUDED from testifying at the trial of this matter.

---

**5.** Interestingly, the two Laidlaw bus drivers who now operate the buses equipped with the air seat both testified that they suffered injuries immediately **after** the heavy duty dampers recommended by Mr. Davis and Mr. Suckey were installed and that as a result, the heavy duty dampers were removed and the standard dampers (which had been in use on the date of Mr. Dearson's injury) were promptly reinstalled. (See Defendants' Exhibits "H" and "I").