'Laura CABRERA, Plaintiff,

v.

**CORDIS CORPORATION; and Dow Corning Corporation, Defendants.**

No. CV–S–94–720–PMP(RJJ).

United States District Court, D. Nevada.

Sept. 13, 1996.

---

Lawrence E. Mittin, Janet S. Markley, Antonia C. Killebrew, Susan Winters, Gillock, Koning, Markley & Killebrew, Las Vegas, NV, for Cabrera.

Roger L. Erickson, Erickson, Thorpe & Swainston, Ltd, for Dow Corning.

Leann Sanders, Sandra Smagac, Alverson, Taylor, Mortensen & Nelson, Las Vegas, NV,

Kathlene Landgraf Kolts, Kolts & Nawa, Pasadena, CA, for Cordis Corp.

## ORDER

PRO, District Judge.

Before the Court for consideration are Defendant Cordis Corporation's Motions in Limine to Exclude the Testimony at Trial of Plaintiff's Experts Saul Puszkin, Ph.D. (# 142), Aristo Vojdani, Ph.D. (# 149), Nachman Brautbar, M.D. (# 146), and Pierre Blais, Ph.D. (# 144). Also before the Court is Plaintiff's Motion in Limine Limiting Dr. Joan Venes' Testimony (# 130) and Plaintiff's Motion in Limine Precluding Admission of Defendant's Exemplar into Evidence and Precluding Dr. Ratner's Opinions Derived Therefrom, or in the Alternative, Request for F.R.E. 104 Hearing (# 124).

The foregoing Motions have been fully briefed. On August 1 and 6, 1996, the Court conducted a hearing pursuant to F.R.E. 104(a) to determine whether or to what extent the opinions of each challenged expert is admissible under F.R.E. 702. Each of the foregoing experts, except Dr. Ratner, testified at the hearing.

### I. Factual Background

In 1977, Plaintiff Laura Cabrera, then age 15, had a Cordis–Hakim ventriculoperitoneal brain shunt implanted in her head to relieve the pressure caused by the retention of cerebrospinal fluid resulting from a condition known as hydrocephalus. The brain shunt was manufactured by Defendant Cordis Corporation.

This is a products liability action wherein Cabrera claims that the Cordis–Hakim brain shunt is defective. Cabrera alleges causes of action for strict liability in tort, failure to warn, breach of express and implied warranties, breach of warranty of fitness for a particular purpose, failure to comply with the provisions of the Food, Drug and Cosmetics Act, misrepresentation, fraud/concealment, negligence per se (violation of NRS § 598.0917(5)–Deceptive Trade Practices), intentional and negligent infliction of emotional distress, negligent hiring and supervision, corporate negligence/vicarious liability, and general and special damages, including attorneys' fees and punitive damages. Cabrera further alleges that the brain shunt was defectively designed and manufactured in that:

(1) Cordis failed to perform any long-term tests to determine the durability and biocompatibility of the materials composing the device;

(2) Cordis failed to warn the recipients of the brain shunt that they had not performed long-term testing of the shunts and therefore were unaware of the adverse consequences of long-term implantation; and

(3) Cordis did not establish a tracking mechanism by which recipients of the brain shunt could be notified in the event of device failure and/or recall.

Additionally, Cabrera claims she is suffering from silicone toxicity because the silicone components of the brain shunt have caused her body to produce silicone antibodies. Cabrera contends that the silicone toxicity has caused her to suffer from a variety of autoimmune ailments such as allergies, chronic fatigue and Epstein–Barr Syndrome. Cabrera also contends that she faces possible death or brain damage if and when the brain shunt needs to be replaced or repaired.

### II. The *Daubert* Test

Defendant Cordis' Motions In Limine seek to exclude at trial the testimony of Cabrera's proposed expert witnesses Puszkin, Vojdani, Brautbar and Blais under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Rule 702 of the Federal Rules of Evidence provides that

... If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

Under the *Daubert* analysis of F.R.E. 702, the trial court performs a "gatekeeping role," which requires that the court satisfy itself that the proffered expert scientific testimony meets certain standards of reliability before

it is admitted. *Daubert,* 509 U.S. 595–97, 113 S.Ct. at 2798. The *Daubert* Court explained that in order to determine whether an expert's proffered testimony communicates "scientific knowledge," the trial court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592–93, 113 S.Ct. at 2796.

The *Daubert* Court listed four non-exclusive factors the trial court is to consider in determining whether an expert's testimony is based on reliable scientific knowledge: (1) whether the theory or method employed by the expert has gained general acceptance in the relevant scientific community; (2) whether the method has been subject to peer-review and publication; (3) whether the method employed can be and has been tested; and (4) whether the known or potential rate of error and the existence and maintenance of standards controlling the technique is acceptable. *Id.* at 591–95, 113 S.Ct. at 2796–97. The four factors enumerated are illustrative rather than exhaustive, and may not be equally applicable in every case. For example, where an expert has not conducted original research, but is offering an opinion based upon that expert's survey of available literature, the last two factors may not apply at all. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 n. 4 (9th Cir.1995).

On remand from the United States Supreme Court, the Ninth Circuit Court of Appeals provided the following additional guidance to trial courts:

> One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. That an experts testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office. (Footnote omitted.)

> That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science.... For one thing, experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration; when an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests. Then, too, independent research carries its own indicia of reliability, as it is conducted, so to speak, in the usual course of business and must normally satisfy a variety of standards to attract funding and institutional support. Finally, there is usually a limited number of scientists actively conducting research on the very subject that is germane to a particular case, which provides a natural constraint on parties' ability to shop for experts who will come to the desired conclusions. That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were "derived by the scientific method."

*Id.* at 1317.

### III. Defendants' Motions in Limine

It is against the standards provided by the Supreme Court and the Ninth Circuit Court of Appeals in *Daubert,* that this Court must consider the proffered testimony of Plaintiff's experts, Saul Puszkin, Aristo Vojdani, Nachman Brautbar and Pierre Blais.

#### 1. Saul Puszkin, Ph.D.

Saul Puszkin holds a Ph.D. in neuroscience and has worked in the fields of pathology and immunology for more than twenty years.

Dr. Puszkin testified that he examined two tissue slides from Cabrera under a microscope. The first was a nipple discharge sample from Cabrera which revealed no foreign bodies. The second was skin tissue from a

cyst removed from Cabrera's head which revealed a giant cell reaction to a foreign particle which Dr. Puszkin could not identify. Further, Dr. Puszkin could not dispute a test performed on the same tissue by Defendants' expert pathologist, Allen Anes, M.D., which showed the foreign particle to be keratin, a naturally occurring substance in the human body.

The Court concludes that the proffered expert testimony of Dr. Puszkin does not directly present an issue under *Daubert*. Simply put, Puszkin looked at tissue through a microscope and observed a giant cell reaction to a foreign body which he could not identify at all, let alone as silicone. As such, Dr. Puszkin's testimony is simply irrelevant under F.R.E. 401 and is not, in and of itself, helpful to the trier of fact under F.R.E. 702.

### 2. Aristo Vojdani, Ph.D.

■ Dr. Vojdani holds a Ph.D. in immunology. Cabrera proposes to call Dr. Vojdani to testify to the results of a blood test he performed on a sample of Cabrera's blood in August 1993, which according to Dr. Vojdani revealed the presence of silicone antibodies.

Cordis contends, however, that Dr. Vojdani's "silicone antibody blood test" meets none of the standards for reliability under *Daubert*. The Court agrees.

Indeed, Dr. Vojdani's testimony establishes that he is the only one who uses the particular "silicone antibody blood test" which he alone developed. There is, in fact, no other generally accepted blood test for the presence of silicone antibodies. Dr. Vojdani testified that all lab notes and other documentation regarding the development of his particular silicone antibody blood test have been destroyed, and that no peer-review has been conducted regarding the methodology of his test. Additionally, the Food and Drug Administration has not approved Dr. Vojdani's blood test, nor have any peer-review publications recognizing or approving the test been produced.

Dr. Vojdani testified that his silicone antibody blood test was developed in connection with his study of 530 silicone gel breast implant cases, and that he has conducted no studies of the more than one million brain

shunt recipients in the United States. Dr. Vojdani also conceded that he has conducted no research to determine the chemical composition of the Cordis brain shunt implanted in Cabrera, nor has he tested his blood test procedure with any other ventriculoperitoneal shunt materials.

This Court is being asked to admit Dr. Vojdani's testimony based solely upon his claim that the silicone antibody blood test he has developed is a valid scientific test. Beyond the bald assertions of Dr. Vojdani, the Court has no basis for doing so and concludes that the proffered testimony completely fails to meet the *Daubert* standard for admissibility under F.R.E. 702.

### 3. Nachman Brautbar, M.D.

■ Dr. Brautbar is a medical doctor who is board certified as an internist with a speciality in nephrology. Cabrera has identified Dr. Brautbar as her expert in the field of toxicology and internal medicine. Dr. Brautbar testified that he advertises on the World Wide Web as an expert for plaintiffs in silicone gel breast implant cases, but acknowledged that he is not an expert regarding the design or manufacture of ventriculoperitoneal brain shunts such as that implanted in Cabrera. Dr. Brautbar also testified that he does not know the chemical composition of Cabrera's brain shunt and that his theories regarding silicone toxicity in silicone gel breast implant cases have not been tested in cases involving brain shunts.

Dr. Brautbar testified that he conducted a neurological examination of Cabrera, but took no blood or urine samples. He testified that Cabrera complained of joint pain suggesting arthritis, and that she also complained of fatigue, but did not appear to be suffering from chronic fatigue syndrome. Additionally, Cabrera was suffering from a rash on portions of her body and also complained of tingling in her hands and evidenced muscle weakness. Dr. Brautbar expressed the opinion that Cabrera's medical complaints are the result of silicone toxicity.

The Court finds that Dr. Brautbar's proffered testimony fails to qualify as reliable scientific testimony under the four factors enumerated in *Daubert*. In essence, Dr.

Brautbar offers testimony that Cabrera's medical problems are silicone induced because he says so. Clearly, Dr. Brautbar's theory cannot be viewed as having gained general acceptance in the relevant scientific community, nor is there any apparent way to test the validity of his opinions. Indeed, the clear weight of medical/scientific authority cited by Cordis' expert neurosurgeon, Dr. Joan Venes, suggests there is no verifiable nexus between silicone implants and the auto-immune problems Cabrera complains of, nor is there a scientifically valid method of testing for silicone antibodies or for diagnosing silicone toxicity. Moreover, it appears that Cordis is correct that Dr. Brautbar has developed his opinions expressly for purposes of testifying in this case and that he has not himself performed any tests nor can he rely on other published tests or data regarding brain shunts to substantiate his theories. Under the circumstances and in accord with *Daubert*, the Court concludes that his expert testimony should be excluded.

#### 4. Pierre Blais, Ph.D.

Dr. Blais holds a Ph.D. in physical chemistry. Cabrera has named Dr. Blais as her products defect expert who is expected to offer testimony regarding defects in the Cordis brain shunt implanted in Cabrera.

Cordis objects to Dr. Blais' expert testimony contending that he has developed his opinions expressly for purposes of testifying in this case, and that he has not performed any tests regarding the Cordis brain shunt implanted in Cabrera, nor has he relied on any other published tests to support his theories.

Cabrera replies that Dr. Blais should not be prohibited from testifying as a biomaterials expert simply because no one has funded a study specifically linking configurations of silicone as inappropriate material for brain shunts. The problem with Cabrera's argument in this regard, however, is that absent studies or other evidence tending to support the testimony of Dr. Blais, the Court and the jury would be left with nothing more than the opinion of Dr. Blais that the brain shunt implanted in Cabrera is not safe. Cabrera would offer such testimony from Dr. Blais notwithstanding the fact that Dr. Blais concedes he does not know the chemical composition of Cabrera's brain shunt, and the lack of data suggesting that hard silicone elastomers are inappropriate for brain shunts.

Moreover, Dr. Blais has acknowledged that his theory regarding the deterioration of Cabrera's brain shunt is not based upon an examination of the brain shunt implanted in Cabrera, nor is it based upon scientific literature in the field. Similarly, with respect to his criticism of the design of the flanged tipped catheter utilized in Cabrera's brain shunt, Dr. Blais is unable to point to any literature criticizing the design or to any other data support his opinion. The same is true of Dr. Blais' opinions regarding deterioration or degradation of the shunt implanted in Cabrera. By comparison, Cordis' proposed expert, Dr. Joan Venes, who has implanted and explanted over 2,000 brain shunts, has testified that none of the theories offered by Dr. Blais are supported by her experience or the generally accepted scientific data upon which she relies.

As with the testimony of Dr. Brautbar, the opinions expressed by Dr. Blais are not generally accepted in the scientific community and have not been subjected to scientific testing or peer review. Dr. Blais' opinions are no doubt sincere, but sincerity is not an indication of reliability when *Daubert* or any other reasonable standard for the admission of expert testimony.

The Court concludes that based upon the foregoing, Defendants' Motions In Limine to Exclude the Testimony at Trial of Plaintiff's Experts Saul Puszkin, Ph.D. (# 142), Aristo Vojdani, Ph.D. (# 149), Nachman Brautbar, M.D. (# 146), and Pierre Blais (# 144) should be granted. **IT IS SO ORDERED.**

### IV. Plaintiff's Motions In Limine

#### 1. Joan Venes, M.D.

Joan Venes, M.D., is a neurosurgeon who over the past 25 years has performed over 2,000 implants and/or explants of ventriculoperitoneal brain shunts, and who has cared for numerous patients with hydrocephalus.

By her Motion In Limine, Cabrera seeks to limit Dr. Venes' testimony in ten

general areas. The Court concludes that Cabrera's Motion is not reasonably capable of resolution pretrial, but is more appropriately reserved until the time of trial. At trial the Court can evaluate the areas of expert opinion which Cordis would propose to present Dr. Venes, thereby allowing the Court to adjudicate Cabrera's Motion to limit Dr. Venes' testimony in the evidentiary context of trial. This is particularly important for two reasons. First, it is not at all clear that Cordis will seek to elicit expert opinions from Dr. Venes in some of the areas objected to by Cabrera. Second, given this Court's earlier Orders in Limine regarding Cabrera's experts, it is not yet clear what claims Cordis will be required to defend at trial.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion In Limine to Limit Dr. Joan Venes' Testimony (# 130) is denied without prejudice to renew the same at the time of trial.

2. **Plaintiff's Motion In Limine Precluding Admission of Defendant's Exemplar Into Evidence and Precluding Dr. Ratner's Opinions Derived Therefrom**

The Court having read and considered the foregoing, and having considered the arguments of counsel presented at the hearing conducted August 6, 1996, and good cause appearing,

**IT IS ORDERED** that Plaintiff's Motion In Limine Precluding Admission of Defendant's Exemplar Into Evidence and Precluding Dr. Ratner's Opinions Derived Therefrom (# 124) is denied.