Kaney F. O'NEILL, Plaintiff–
Appellant,

v.

WINDSHIRE–COPELAND ASSOCI-
ATES, LP; Robert Copeland; Hercu-
les Real Estate Services, Incorporated,
*Defendants–Appellees,*

and

Autumn Lakes Associates, Limited
Partnership; SC Diamond Corpora-
tion; John Does 1 through 20, Defen-
dants.

No. 02–1271.

United States Court of Appeals,
Fourth Circuit.

Argued: April 1, 2003.

Decided: June 16, 2004.

**ARGUED:** Earle Duncan Getchell, Jr., McGuirewoods, L.L.P., Richmond, Virginia, for Appellant. Steven Walter Bancroft, Trichilo, Bancroft, McGavin, Horvath & Judkins, P.C., Fairfax, Virginia, for Appellees. **ON BRIEF:** Amy M. Burden, McGuirewoods, L.L.P., Richmond, Virginia; Irwin M. Zalkin, Michael Zimmer, Zalkin & Zimmer, L.L.P., San Diego, California, for Appellant. Melissa H. Katz, Michael J. Carita, Trichilo, Bancroft, McGavin, Horvath & Judkins, P.C., Fairfax, Virginia; Frank K. Friedman, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, Virginia, for Appellees.

Before MICHAEL and KING, Circuit Judges, and Terry L. WOOTEN, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by published per curiam opinion.

PER CURIAM:

Based on the jury's finding of contributory negligence, the district court entered judgment against Kaney F. O'Neill in her action to recover for debilitating injuries suffered in a fall at an apartment complex. O'Neill appeals, arguing first that the district court erred in submitting the contributory negligence issue to the jury. She also argues that the court erred in excluding the testimony of an expert in biomechanics and in admitting a toxicology report of her blood alcohol content. The Supreme Court of Virginia's answer to our certified question on the contributory negligence issue, *see O'Neill v. Windshire–Copeland Associates, L.P.,* 267 Va. 605, 595 S.E.2d 281 (2004), establishes that the district court properly submitted that issue to the jury. In addition, the district court did not abuse its discretion in making the challenged evidentiary rulings. We therefore affirm.

## I.

Kaney O'Neill was rendered a quadriplegic on September 15, 1999, when she fell backward over a second-story balcony railing at an apartment complex in Newport News, Virginia. The apartment complex was owned by Windshire–Copeland Associates, L.P., whose general partner was Robert Copeland; Hercules Real Estate Services, Inc. managed the complex (these three parties are referred to collectively as "Windshire"). Invoking diversity jurisdiction, *see* 28 U.S.C. § 1332, O'Neill sued Windshire in the U.S. District Court for the Eastern District of Virginia to recover for her injuries. She alleged that Windshire was negligent because the thirty-two-inch balcony railing was sixteen inches lower than the Newport News Building Code required at the time the apartment complex was built. The case was tried before a jury.

The evidence at trial included the following. O'Neill arrived at Mike Seehusen's apartment in the Windshire complex around 4:30 p.m. on September 15, 1999. Seehusen was O'Neill's former boyfriend, but the two were still on good terms. A hurricane was on the way, so they decided to invite two of their friends to Seehusen's apartment for the evening "to hang out, have dinner, and enjoy the weather." J.A. 444. Seehusen's second-floor apartment

had a balcony. The balcony was fenced in with a metal grating that was topped with a railing thirty-two inches high. Although it was windy and rainy that evening, O'Neill went out on the balcony several times. On those occasions, she would lean backward against the railing to catch the rain on her face. Shortly before 9:00 p.m., O'Neill went onto the balcony the final time. She leaned against the railing with her buttocks resting on top and "was tilting back a little bit." J.A. 453. According to O'Neill, she was deep in thought and was startled by a sharp slap of rain in her face. When the rain hit her face, she "fl[u]ng [her] head," lost her balance, and fell backward over the railing. J.A. 555. She landed on the concrete patio fifteen to twenty feet below. As a result of her fall, O'Neill is a quadriplegic.

The emergency medical technician who attended O'Neill right after the accident testified that O'Neill was awake, oriented, and able to make clear and appropriate responses to his questions. O'Neill's emergency room records at the Riverside Medical Center reveal that her speech was clear and her vision normal. O'Neill told hospital personnel at the emergency room that she had consumed alcohol that evening. Blood for a toxicology screen was then drawn by a hospital staffer who used an alcohol swab. The lab report indicated that O'Neill's blood alcohol content was .18.

At the close of the evidence, the district court granted in part O'Neill's motion for judgment as a matter of law, concluding that Windshire was negligent per se be-

cause its low balcony guardrail violated the height requirement of the Newport News Building Code. The court determined, however, that Windshire's negligence did not bar the defense of contributory negligence, and the question of contributory negligence was submitted to the jury. The jury found that O'Neill was contributorily negligent, and on the basis of that finding the district court entered judgment for Windshire.

O'Neill appealed the judgment to this court, arguing that the district court erred in submitting the issue of contributory negligence to the jury. Specifically, O'Neill argued that under the Restatement (Second) of Torts § 483 the defense of contributory negligence was not available here because it would defeat the purpose of the railing height requirement in the building code.[1] O'Neill also appealed two evidentiary rulings made by the district court.

We were uncertain whether Virginia law would treat O'Neill's contributory negligence as a complete defense in this case. We therefore certified the following question to the Supreme Court of Virginia pursuant to its Rule 5:42:

If the defendant-owner of an apartment building is negligent per se because the protective railing on its apartment balcony does not comply with the height requirements of a municipal building code, and if that negligence is a proximate cause of the plaintiff's fall from the balcony and her resulting injuries, is the plaintiff's contributory negligence avail-

---

1. The Restatement (Second) of Torts § 483 (1965) provides:

    The plaintiff's contributory negligence bars [her] recovery for the negligence of the defendant consisting of the violation of a statute, unless the effect of the statute is to place the entire responsibility for such harm as has occurred upon the defendant.

Comment (c) to § 483 explains that a statute places the entire responsibility for harm on the defendant "where it is enacted in order to protect a certain class of persons against their own inability to protect themselves."

able to the defendant as a complete defense?

The Supreme Court of Virginia answered our question in the affirmative, holding that " § 483 of the Restatement (Second) has not been adopted in [Virginia] and ... the defense of contributory negligence is available when the defendant's violation of a municipal building code is negligence per se and a proximate cause of the plaintiff's injuries." *O'Neill v. Windshire–Copeland Associates, L.P.,* 267 Va. 605, 595 S.E.2d 281, 284 (2004).

The Supreme Court of Virginia "recognize[d] that there are circumstances in which a legislative body may determine that, because of the nature of the regulation or the class of persons the regulation was intended to protect, the defendant should bear the entire responsibility for harm that the failure to comply with the regulation causes." *Id.* at 283. However, in this case, the court held that "nothing in the Newport News Building Code indicates that the purpose of the code was to place the entire responsibility for injuries stemming from a code violation on the defendant building owner. The code protects no specific class; it is the public in general that benefits from its provisions." *Id.* at 284. Therefore, the court held that contributory negligence provided Windshire a complete defense to O'Neill's personal injury claim.

In view of this answer to our certified question, we affirm the district court's decision to submit the issue of O'Neill's contributory negligence to the jury.

## II.

■ O'Neill also raises two evidentiary issues. First, she argues that the district court erred in excluding certain expert testimony about the cause of her fall. Second, O'Neill argues that the court erroneously admitted the results of a hospital-administered toxicology test used to measure her blood alcohol content. We review these evidentiary rulings for abuse of discretion. *General Elec. Co. v. Joiner,* 522 U.S. 136, 141–43, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

## A.

■ O'Neill claims that the district court erroneously excluded the expert testimony of Dr. David A. Thompson, a professor of biomechanics, who would have testified that a gust of wind caused O'Neill's fall. Thompson authored a report that measured the amount of force various wind-gust levels would place on O'Neill's upper torso. The report also described where O'Neill's center of gravity was in relation to the thirty-two-inch railing. Although Thompson conceded in his report that "what triggered [O'Neill's] fall is not clear," J.A. 205, he concluded that "it does not appear likely to me that someone of Ms. O'Neill's athletic skill and ability would have accidentally leaned over too far backwards and lost her balance and fallen. Rather, it seems much more likely that an unexpected gust of wind triggered her fall to the ground below causing her tragic injury." J.A. 209.

In ruling on Windshire's motion to exclude Dr. Thompson's testimony, the district court first observed that "there's certain things Dr. Thompson said, such as the plaintiff's ... center of gravity may be higher than thirty-two inches, for example, and there may be other things in there that could be admissible." J.A. 387. On the critical issue, however, the court held that Dr. Thompson's statements "as to how and why the accident happened [are], in the opinion of the court, not admissible under the applicable rules for expert testimony." J.A. 387–88.

O'Neill argues that the district court should have permitted Dr. Thompson to offer his opinion as to what caused O'Neill's fall. Under Federal Rule of Evidence 702 an "expert opinion must be based on scientific, technical, or other specialized knowledge *and not on belief or speculation,* and inferences must be derived using scientific or other valid methods." *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 200 (4th Cir.2001) (emphasis added). As indicated above, Dr. Thompson concluded that O'Neill's fall was "much more likely" to have been caused by the wind because "it does not appear likely . . . that someone of Ms. O'Neill's athletic skill and ability would have accidentally leaned over too far backwards and lost her balance." J.A. 209. This opinion appears to be based more on supposition than science, especially since Dr. Thompson admitted that the cause of O'Neill's fall was "not clear." Accordingly, the district court did not abuse its discretion in excluding Dr. Thompson's opinion on this issue.[2]

### B.

O'Neill also contends that the district court improperly admitted the results of a toxicology test taken while O'Neill was being treated at the Riverside Medical Center (Riverside). The test indicated that O'Neill had a blood alcohol content level of .18 an hour after she fell from the balcony. O'Neill argues that the test result was inherently unreliable for two reasons. First, the hospital used an alcohol swab to sterilize O'Neill's arm before taking the blood sample. Second, the blood test result was printed on a form that said "these

results should not be used for any legal purpose." J.A. 224.

■ O'Neill argues that her toxicology test result was unreliable because her arm was wiped with an isopropyl alcohol swab before her blood was drawn. According to O'Neill, this procedure may have resulted in an inflated blood alcohol measurement. The evidence provides no support for O'Neill's argument. The director of Riverside's emergency room testified that the hospital's procedures for measuring blood alcohol content, which normally includes the use of an alcohol wipe, are reliable and trustworthy. The director also said that emergency room physicians, anesthesiologists, and surgeons rely upon these toxicology reports when making treatment decisions. The Director of the Clinical and Forensic Toxicology Laboratories at the Medical College of Virginia Hospital testified that the testing procedures used in this case were reliable and that the use of an isopropyl swab or cleanser would have no effect on a blood alcohol reading. He also detailed the high accreditation standards that Riverside's laboratories are required to meet in order to receive state funding. Part of this accreditation process requires the hospital to demonstrate that the testing procedures used in its laboratories are proficient. O'Neill did not call a single witness who questioned the reliability of Riverside's procedures. In fact, O'Neill's own toxicologist expert admitted that he had no reason to believe that the blood alcohol reading of .18 was inaccurate. Under these circumstances, we hold that Riverside's medical procedures were sufficiently reliable to justify the admission of O'Neill's blood alcohol test results.

---

**2.** Not everything in Dr. Thompson's report was inadmissible. As the district court noted, he could have testified about where O'Neill's center of gravity was in relation to the thirty-two-inch railing. Dr. Thompson could also have testified as to the amount of force that specific wind velocities would exert on a human torso. That would have been expert testimony based on "scientific, technical, or other specialized knowledge." Fed.R.Evid. 702.

O'Neill also argues that the blood test result was "unreliable, incompetent, and irrelevant," J.A. 221, because it was marked with the words "these results should not be used for any legal purpose," J.A. 224. Again, all of the evidence indicated that the procedures used in arriving at this blood test result were reliable and regularly relied upon by medical professionals to make treatment decisions. O'Neill offered no evidence to the contrary. We do not believe the results of an otherwise reliable medical procedure are rendered inadmissible simply because a hospital says that the results should not be used in legal proceedings. The law and the rules of evidence determine what is admissible in a court proceeding. Accordingly, the district court did not err in admitting the results of the toxicology test.

The judgment is affirmed.

*AFFIRMED*